UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOHN K. MACIVER INSTITUTE FOR PUBLIC POLICY and WILLIAM OSMULSKI,<br><br>Plaintiffs,<br><br>v.<br><br>TONY EVERS, in his official capacity as Governor of the State of Wisconsin,<br><br>Defendant. | No. 3:19-cv-00649-SLC |

**MEMORANDUM OF LAW SUPPORTING
MOTION FOR PRELIMINARY INJUNCTION**

The First Amendment protects a right of equal access among journalists to public events and press briefings by public officials. Officers of the state may not selectively target particular journalists for exclusion from the press corps based on their coverage or viewpoint or their editorial board's viewpoint. In this case, Governor Tony Evers has prevented Plaintiffs MacIver Institute and William Osmulski from attending press briefings open to other journalists and excluded Plaintiffs from a media listserv that invites journalists to the Governor's press conferences and public events. This extraordinary violation of the First Amendment

1

demands prompt rectification by an extraordinary remedy: a preliminary injunction protecting these journalists' First Amendment rights.

Though a preliminary injunction is an extraordinary remedy, it is appropriate in cases like this where an elected official bars a journalist from equal press access. *See CNN v. Trump*, No. 1:18-cv-02610-TJK, transcript of TRO hearing on Nov. 18, 2018, https://en.wikipedia.org/wiki/File:CNN_v._Trump_transcript_2018-11-16.pdf (D.D.C.) (Judge Kelly grants a temporary restraining order restoring the White House press pass of CNN reporter Jim Acosta). After reviewing the Seventh Circuit's three factors and the balance of harms, this Court should issue a preliminary injunction protecting these journalists' First Amendment rights.

## FACTS

The MacIver Institute is a 501(c)(3) nonpartisan, nonprofit organization based in Madison, Wisconsin (Healy Affidavit, 2). It bills itself as "the Free Market Voice for Wisconsin" (Healy Affidavit, 3). It sponsors research and scholarship and the MacIver News Service, an accredited team of journalists who cover important stories related to state and local government in Wisconsin (Healy Affidavit, 4). None of its employees are registered to lobby on any pending rules or legislation (Healy Affidavit, 5). Last year (2018) the MacIver Institute won a bronze award in the "Excellence in Journalism" competition from the Milwaukee Press Club for their long-form, hard-news reporting (Healy Affidavit, 6). MacIver is credentialed by the

Wisconsin State Legislature to cover its activities (Healy Affidavit, 7). Neither William Osmulski nor any other MacIver journalist has ever been ejected from a press conference for being disruptive or disrespectful (Healy Affidavit, 8; Osmulski Affidavit, 12).

William (Bill) Osmulski is the news director for the MacIver Institute (Osmulski Affidavit, 1). He previously worked as an award-winning television news reporter or editor in Milwaukee, Madison, and Eau Claire (Osmulski Affidavit, 2-3). He currently produces a public-affairs show for WVCY-TV 30 in Milwaukee (Osmulski Affidavit, 4).

Tony Evers is Governor of Wisconsin. He regularly holds press conferences to answer questions from news media. He also regularly holds public events after which he will answer questions from news media (sometimes called a media avail or gaggle in the industry). He advises over 1,000 media outlets and others of these events by emails that are sent by his press staff to an electronic media-advisory listserv (see Exhibit 1, the list of recipients of the listserv, and Exhibit 2, several example media advisories; both exhibits were obtained through public records requests).

From the beginning of the Evers administration in January, Osmulski and his former MacIver colleague Matt Kittle have requested numerous times to be on the media-advisory listserv, and the Governor continues to exclude them from this listserv (Osmulski Affidavit, 5). Exclusion from the listserv makes it substantially

harder for MacIver reporters to attend and ask questions at the Governor's events and press conferences.

When the MacIver reporters learn of the Governor's press events by other means, whether from news corps colleagues or published reports, they are sometimes permitted in and sometimes denied access. In February 2019, the Governor's office hosted a press briefing for the Capitol press corps several hours before the Governor announced the biennial budget (Exhibit 3). During this meeting, Capitol beat reporters were given early access to key budget documents and the opportunity to ask questions of top administration officials. MacIver journalists did not receive notification of the briefing (Osmulski Affidavit, 6). They heard about it from other reporters and emailed the Governor's press staff with their RSVP (Osmulski Affidavit, 7). When they went to the room where the briefing was held, they were stopped by staff and told they were not on the RSVP list (Oslumski Affidavit, 8). When they asked whom they could speak to about this, they were told that the relevant staffer (Melissa Baldauff, the Governor's deputy chief of staff responsible for communications) was unavailable, but that they could email or call her (Osmulski Affidavit, 9). They were not permitted in the briefing (Osmulski Affidavit, 10). The MacIver journalists subsequently contacted Baldauff several times, and never received a response (Osmulski Affidavit, 11). Counsel for the journalists also wrote a letter to Baldauff and the Governor explaining the law as laid out in this memorandum, and was rebuffed in his request for his clients to

receive equal access (Exhibits 4, Suhr's initial letter, 5, Governor's response, and 6, Suhr's response).

Upon investigation and the filing of several open records requests, the MacIver journalists learned that their exclusion from the budget briefing was part of a consistent pattern of exclusion leaving them out of notifications about the Governor's public events and press conferences. Though given several opportunities to change course (Osmulski Affidavit, 11; Exhibits 4, 6), the Governor has persisted in his policy of barring these journalists from equal access and treatment.

## STANDARD OF REVIEW

The U.S. Court of Appeals has set up a two-stage test for the issuance of a preliminary injunction:

> A party seeking a preliminary injunction must satisfy all three requirements in the "threshold phase" by showing that (1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc*., 549 F.3d 1079, 1086 (7th Cir. 2008). If a party makes the necessary showing, the court moves to the "balancing phase." *Id*. At that phase, the court employs a sliding-scale approach and "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015).

*HH-Indianapolis, LLC v. Consol. City of Indianapolis*, 889 F.3d 432, 437 (7th Cir. 2018). Considering these three factors, this Court should conclude that the Plaintiffs have made the requisite showings, and that the balance of harms favors their request.

## ARGUMENT

The Court should issue a preliminary injunction enjoining the Governor from continuing to exclude MacIver journalists from equal press access. Plaintiffs will suffer irreparable harm without an injunction because they will continue to be denied equal access from press events, traditional legal remedies are inadequate to resolve this harm, and Plaintiffs are likely to success on the merits of their constitutional claims.

### I. Plaintiffs suffer irreparable harm by being excluded from equal access to the Governor's press events.

MacIver's journalists suffer irreparable harm every day that they are excluded from equal access to the Governor's press events. The Governor regularly holds events in the state capitol, in Madison, and across the state. During these events, he announces new initiatives, delivers remarks on the important topics facing the state, interacts with constituents, and takes questions from the news media. It is the bread-and-butter of reporting for statehouse journalists to cover these events and to ask questions about national and state news.

Every day that the MacIver journalists are denied equal access to these events, their ability to report important news is substantially compromised. "A person singled out for exclusion from the courtroom, who is thereby barred from first-hand knowledge of what is happening there, … is placed at an extraordinary disadvantage in his or her attempt to compete in the 'marketplace of ideas.'" *Huminski v. Corsones*, 386 F.3d 116, 146 (2d Cir. 2004). Though they continue to work hard and regularly break other stories, the MacIver journalists must rely on others' reporting and after-the-fact press releases to know the Governor's activities. Though they occasionally learn of public events or press conferences beforehand from other sources, the vast majority of the time leaving them off the listserv prevents them from asking the Governor questions about stories they are reporting on or the news he is making at these stops.

Moreover, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" for purposes of the issuance of a preliminary injunction. *Backpage.com, LLC v. Dart, 807 F.3d 229, 239 (7th Cir. 2015)* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As demonstrated below in the discussion of likelihood of success on the merits, these are fundamental First Amendment freedoms, the loss of which is just such an irreparable injury.

**II.     Traditional legal remedies are inadequate to resolve the irreparable harm Defendants have caused to Plaintiffs.**

Traditional legal remedies (i.e., money damages) are inadequate. The injury here is literally "irreparable"—there is no way for the Governor to later make whole the lost opportunity to exercise First Amendment freedoms or to cover important news conferences or press events.

Furthermore, Plaintiffs ask for no damages in their complaint. They seek only equal and fair treatment like the rest of the press corps. This is a circumstance "when the nature of the loss incurred by the plaintiff makes it difficult to calculate damages." *Girl Scouts of Manitou Council*, *Inc*., 549 F.3d at 1095. Though the Plaintiffs' work as a journalism outlet is impacted by the denial of equal treatment, it is hard to put a dollar value on its loss of access. As a nonprofit news source the Institute is not in the business for dollars; it goes about its work because it believes in its mission. The Governor's actions, however, make it substantially harder for it to go about that mission successfully when he denies them basic equal access to the top elected official in the state.

**III.    Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment Claims.**

Plaintiffs are likely to succeed on the merits of their First and Fourteenth Amendment claims. At a minimum, they pass the "low threshold" that their claims

8

have a "better than negligible" chance of success. *HH-Indianapolis, LLC*, 889 F.3d at 437.

> **A. Plaintiffs are likely to succeed on their First Amendment claim against Defendant for violating their right to equal access to information and events. (Count I)**

The First Amendment's freedom of the press clause includes a right of equal access for all journalists to information or events made generally available to the press corps. *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977) ("Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information."). *Accord Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986); *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) ("once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media..."); *Lewis v. Baxley*, 368 F. Supp. 768, 777 (M.D. Ala. 1973) (freedom of the press includes equal access of media to press conferences).

This is an important First Amendment right which is protected by strict scrutiny. *Sherrill,* 569 F.2d at 130 ("such refusal must be based on a compelling governmental interest."); *United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1375 (S.D. Fla. 2002) (same); *Borreca v. Fasi*, 369 F. Supp. 906, 909 (D. Haw. 1974) (same). *See United States v. Connolly*, 204 F. Supp. 2d 138, 139 (D.

Mass. 2002) ("[O]nly in the most extraordinary circumstances is the government permitted, consistent with the First Amendment, to discriminate between members of the press in granting access to trials and other governmental proceedings.").

In this instance, the MacIver journalists have been denied the equal access which the First Amendment guarantees them. They are prevented from engaging in newsgathering at the Governor's events and press conferences on the same basis as all of their colleagues in the press corps. They have been arbitrarily excluded from the Governor's press events and listserv while hundreds of other journalists, and many non-journalists, are included on the same list.

Moreover, the Governor can present no compelling interest at stake in such a denial. The MacIver journalists have never been disruptive or disrespectful in a press conference with Governor Evers or any other public official. *See CNN v. Trump*, No. 1:18-cv-02610-TJK, (D.D.C. Nov. 2018) (On TRO review, Jim Acosta's behavior during a presidential press conference not a basis for revoking his press pass). They present no security threat to the Governor. *See Sherrill*, 569 F.2d at 130 (Secret Service may deny press passes to genuine security threats to the President). Nor is this an instance where there are simply a limited number of seats for the press pool on Air Force One. *See Frank v. Herter*, 269 F.2d 245, 248-49 (1959) (Burger, J., concurring) (Secretary of State may use neutral criteria to allocate press seats on his plane for a foreign trip); *Getty Images News Servs. v. DOD*, 193 F. Supp. 2d 112, 120 (D.D.C. 2002) (same, as to access to military base, but even then the government

should make its neutral criteria known to reporters). There is no obvious sufficient reason that would justify the MacIver journalists' exclusion.

Importantly, this is not a case where the journalists are seeking special treatment. They acknowledge the First Amendment contains no right to an off-the-record tidbit or an exclusive interview. *See Balt. Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006); *Youngstown Publ'g Co. v. McKelvey*, No. 4:05 CV 00625, 2005 U.S. Dist. LEXIS 9476, at *17-18 (N.D. Ohio May 16, 2005). But that is not the type of access Plaintiffs seek here. Instead, they only want the same access that all members of the Capitol press corps receive to cover the Governor's press events and briefings.

### B. Plaintiffs are likely to succeed on their First Amendment claim against Defendant for discriminating against them based on their viewpoint. (Count II)

The First Amendment's freedom of speech clause prohibits government from discriminating among citizens on the basis of viewpoint. *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 394 (1993) ("The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). This prohibition on viewpoint discrimination extends to denying press access based on an outlet's content or viewpoint. *Sherrill*, 569 F.2d at 129 ("arbitrary or content-based criteria for press pass issuance are prohibited under the first amendment"). *See McBride v. Vill. of Michiana*, 100 F.3d 457, 461-62 (6th Cir. 1996) (retaliating against a reporter because of the stories she reports by barring her from equal access violates the First

Amendment); *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 13 (S.D. Iowa 1971). *See also Richmond Newspapers v. Virginia*, 448 U.S. 555, 583 (1980) (Stevens, J., concurring) ("Today, however, for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgment of the freedoms of speech and of the press protected by the First Amendment.").

Press-pass decisions are subject to judicial review for "arbitrariness which would render the basis of the choice discriminatory. If, for example, the choice was limited only to Democrats or only to Republicans, obviously that would be improper and would fall." *Frank*, 269 F.2d at 247 (Burger, J., concurring). This is just what has happened here. Journalists who are affiliated with institutions that have a liberal or progressive viewpoint are included in the Governor's press events and listserv (see Exhibit 1, listing outlets on the listserv including *The Progressive* magazine, Madison *Capital Times* newspaper, and Devil's Advocate radio show). Meanwhile, journalists affiliated with an institution with a conservative or free-market viewpoint, namely the MacIver journalists, are excluded (Healy Affidavit, 3).

In a statement to media in response to the filing of the complaint in this case, the Governor's spokeswoman said he believes in a "fair and unbiased press corps." *Conservative Think Tank Sues Wisconsin's Evers Over Access*, Associated Press, Aug. 7, 2019, available online at https://www.nytimes.com/aponline/2019/08/07/us/ap-us-wisconsin-governor-

access-lawsuit.html. When a government official sets himself up as the judge of his own press coverage to determine when particular reporters are no longer "fair and unbiased," he is basically admitting viewpoint discrimination.

First off, the government has no interest in ensuring only "fair and unbiased" news media can cover public affairs. In fact, quite the opposite: the First Amendment protects a strong, independent press corps that embraces a wide variety of viewpoints. This stems from our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

To our case here, though, any attempt by the government to ensure "fair and unbiased" news media inevitably results in viewpoint discrimination. When government officials get in the business of deciding for themselves which news outlets are "fair and unbiased" in their coverage of those officials, they are making impermissible judgment calls about each outlet's reporting and viewpoint. And those outlets whose viewpoint they don't like, that often file stories or run editorials that are considered critical, or who engage in investigative reporting of an incumbent's administration that uncovers dirty laundry—those outlets are deemed "unfair" and "biased" and thus denied press access. This case is a government official picking winners and losers among the press corps based on whether he feels they criticize

13

him too often. Yet who is the First Amendment's freedom of the press guarantee for? News outlets that praise the incumbent administration do not need its protection. It is precisely those outlets that probe, challenge, and courageously report the real scoop that need shelter from retaliation by the parties in power.

Finally, the "fair and unbiased" test is always applied one-sidedly. The test presumes two categories of journalists (fair and unfair) when there are really three: those who are biased against us, those who are fair, and those who are biased in our favor. Those who are biased against us are excluded, those who are considered fair by us are allowed to remain, and those who are biased in our favor we also sweep in with those who are fair. In other words, an outlet with a conservative-leaning editorial viewpoint is excluded, but several outlets with liberal-leaning editorial viewpoints are included (see the media listserv, Exhibit 1, which includes the Madison *Capital Times*, the *Progressive* magazine, and the Devil's Advocate radio program, all of which have liberal-leaning editorial viewpoints).

This sort of picking-and-choosing who is "fair" or "unbiased" is unconstitutional: "Requiring a newspaper's reporter to pass a subjective compatibility-accuracy test as a condition precedent to the right of that reporter to gather news is no different in kind from requiring a newspaper to submit its proposed news stories for editing as a condition precedent to the right of that newspaper to have a reporter cover the news. Each is a form of censorship." *Borreca*, 369 F. Supp. at 909-10 (finding against a mayor who excluded a particular reporter from press

conferences). The judge in *Borreca* wrote later in his opinion, "[a] free press is not necessarily an angelic press. Newspapers take sides, especially in political contests. Newspaper reporters are not always accurate and objective." *Id*. at 910. The appropriate response, however, is for the government official to dispute or criticize the reporting. But the government official crosses a line "when criticism transforms into an attempt to use the powers of governmental office to intimidate or to discipline the press or one of its members because of what appears in print. . ." *Id*. That is the line Governor Evers has crossed in this case.

    **C.**    **Plaintiffs are likely to succeed on their Fourteenth Amendment claim against Defendant for violating their right to equal protection of the laws. (Count III)**

Finally, the Fourteenth Amendment guarantees all citizens equal protection of the laws against arbitrary or unfair enforcement by state governments. It is a violation of that protection for the government to grant access to one news organization and deny it to another. *McCoy v. Providence Journal Co.*, 190 F.2d 760, 766 (1st Cir. 1951); *Westinghouse Broad. Co. v. Dukakis*, 409 F. Supp. 895, 897 (D. Mass. 1976) (same).

Here again the government must show a compelling state interest to justify its classification. *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 15 (S.D. Iowa 1971) ("Defendants' denial of access by Quad-City to records available to the other media presents an obvious case of denial of equal protection of the law in violation of the Fourteenth Amendment of the federal Constitution. No showing

15

merely of a rational relationship to some colorable state interest suffices to justify a classification between media permitted access to the reports and others which are not so permitted. Any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a compelling governmental interest is unconstitutional."). Again, the Governor cannot meet this standard—there is no such interest which justifies his decision to exclude MacIver while permitting access to all others.

### IV. Plaintiffs and the public will suffer substantial harm without a preliminary injunction while there would be no harm to Defendants should the Court enter a preliminary injunction.

The balance of harms favors the Plaintiffs. First, the harm to MacIver and its journalists is substantial:

> Certainly the exclusion of particular reporters from the news presented each morning at on-the-record press conferences, which hundreds of other reporters are eligible to attend, affects the content and quality of the news that is reported as well as access to the sources of news. Moreover, it is important to recognize that this is not a single, sporadic refusal of access. Exclusion from the press galleries constitutes a permanent disadvantage with regard to the gathering of news and has a significant impact when measured in terms of the First Amendment, both upon the publication excluded and others in similar situations.

*Consumers Union of United States, Inc. v. Periodical Correspondents' Assoc.*, 365 F. Supp. 18, 26 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975).

Second, the exclusion harms not only MacIver and its journalists, but the public at large as well. "Exclusion of an individual reporter also carries with it the danger that granting favorable treatment to certain members of the media allows the government to influence the type of substantive media coverage that public events will receive, which effectively harms the public." *Huminski*, 386 F.3d at 147 (internal quotation marks omitted). In fact, "it appears that the public interest will be well served by [injunctive] relief." *United Teachers of Dade*, 213 F. Supp. 2d at 1376.

Moreover, considering the effect on the other side, the Governor will suffer no harm, "merely involve some minor inconvenience to the [Governor's] press staff." *Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1246 (N.D. Ga. 1981) (granting a preliminary injunction to CNN ordering the White House to include television reporters in the regular press pool for limited-access presidential events on the same basis as print reporters). The inclusion of the MacIver journalists requires nothing more than adding a few names to a listserv or setting a few extra chairs at a press conference; there is no harm to the Governor; only the slightest inconvenience to staff.

## CONCLUSION

The harm suffered by Plaintiffs by Defendant is irreparable, monetary damages are inadequate to resolve Plaintiffs' injury, and Plaintiffs are very likely to

succeed on all three counts of the Complaint. Further, Plaintiffs and the public will suffer a substantial harm by Plaintiff's continued exclusion from Defendant's press events, whereas there is no harm to the Governor from this Court granting Plaintiffs' motion for preliminary injunction, only at most a very slight inconvenience. Plaintiffs respectfully request that their motion be granted.

Dated: August 20, 2019 　　　　　　　　　　Respectfully Submitted,

**JOHN K. MACIVER INSTITUTE FOR PUBLIC POLICY**

**WILLIAM OSMULSKI**

By: 　/s/ *Daniel R. Suhr*

Daniel R. Suhr (WI State Bar #6321108, WDWI admission April 9, 2019)
Jeffrey M. Schwab (pro hac vice motion forthcoming)
Liberty Justice Center
190 South LaSalle Street, Suite 1500, Chicago, Illinois 60603
Telephone (312) 263-7668
Facsimile (312) 263-7702
dsuhr@libertyjusticecenter.org
jschwab@libertyjusticecenter.org

*Attorneys for Plaintiffs*