IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHN K. MACIVER INSTITUTE
FOR PUBLIC POLICY and
WILLIAM OSMULSKI,

        Plaintiffs,

v.                               Case No. 19-CV-0649

TONY EVERS, in his official capacity as
Governor of the State of Wisconsin,

        Defendant.

---

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

## INTRODUCTION

Plaintiffs John K. MacIver Institute for Public Policy and its news director, William Osmulski, (collectively "MacIver"), seek an order from this Court enjoining Wisconsin Governor Tony Evers from excluding MacIver journalists from "generally available press briefings and events and lists announcing such events." (Dkt. 6:1.) Stated otherwise, they seek an order from this Court requiring Wisconsin's Governor to invite MacIver journalists whenever the Governor invites any other journalist to an event.

Their request for this extraordinary relief should be denied because they cannot satisfy a dispositive threshold requirement—that they will suffer

irreparable harm absent an injunction. They have not identified a single "generally available press briefing" that they will not be permitted to attend in the future, and they surely have not demonstrated that they will be irreparably harmed by not attending such a hypothetical press conference. The relief they seek is purely speculative and does not rise to the level of irreparable harm.

MacIver's motion should also be denied because they are not likely to succeed on the merits of the three claims at issue here: (1) a First Amendment claim that they have been denied equal access to events and lists announcing such events; (2) a First Amendment claim that their exclusion from events and lists announcing such events constitutes viewpoint discrimination; and (3) a Fourteenth Amendment equal protection claim that they have been denied equal access to events and lists announcing such events. (Dkt. 1:7–9.) Essentially, they claim that any time Governor Evers invites some news organizations to attend an event, he is obligated to invite every organization or individual that is purportedly interested in disseminating news, including MacIver. There is no legal support for this position. When the government creates a nonpublic forum where access necessarily will be limited, the government is free to exclude individuals or groups so long as the limitations are reasonable and viewpoint neutral. Press conferences and briefings are just such nonpublic forums, and the Governor's limitations on those forums are reasonable and viewpoint neutral.

Finally, even if the Court were to reach the balance-of-harms inquiry (it need not, in light of the foregoing), that inquiry supports denying the injunction. Because there is no limiting principle to the relief MacIver seeks, there would be no practical way to limit access by the media if the Court were to order the Governor to provide access to MacIver. This would impair the dissemination of newsworthy information, thus harming both the Governor and the public.

Because Plaintiffs fail to satisfy any of the requirements for a preliminary injunction, they are not entitled to the relief they seek ordering Governor Evers to invite them to every press event and include them on lists announcing such events.

## BACKGROUND

For the purposes of this preliminary injunction only, Governor Evers does not dispute most of MacIver's proposed findings of fact because they are largely irrelevant. MacIver has proposed no facts showing irreparable harm or likelihood of success on the merits, meaning its proposed facts do not matter to its request for preliminary relief. Governor Evers submits additional relevant facts, which are set forth in the Declaration of Melissa Baldauff and summarized below.

I.      **The Governor's press events.**

Wisconsin Governor Tony Evers regularly holds events during which he answers questions from the news media. (Dkt. 11:2–3 ¶¶ 11–12; Baldauff Decl. ¶¶ 4–39.) These events fall into four general categories: public events, press conferences, press briefings, and one-on-one interviews. (Baldauff Decl. ¶ 3.)

A.      **Public events.**

The Governor's public events sometimes include a period during which the press can ask questions, known as a "press avail." (*Id.* ¶ 4.) These public events are open to all and may be publicized via press releases and social media, including Facebook, YouTube, and Twitter. (*Id.* ¶¶ 4, 6.) For other events, state agencies, elected officials, or organizations may handle notification. (*Id.* ¶ 8.)

Examples of this type of public event that included press avails are the Governor's appearance at the opening ceremonies of the 2019 Wisconsin State Fair and his hosting of multiple budget listening sessions across the state in Spring 2019. (*Id.* ¶ 5.) MacIver, just like any other member of the public, is permitted to attend this type of event, is free to follow the Governor's feeds on the various social media platforms, and is free to sign up for press releases. (*Id.* ¶¶ 4, 6–7.)

**B.      Press conferences.**

The Governor also holds limited access events, where only certain members of the press are invited to attend. (*Id.* ¶¶ 9–20, 30–38.) These events allow the media to learn about the Governor's different initiatives, plans, or priorities and report back to the public. (*Id.* ¶ 9.) Attendance at these events is necessarily limited due to time, space, security, and other concerns unique to the venue. (*Id.* ¶¶ 11–12.) An example of this type of event is the Governor's tour of the UW-Milwaukee School of Freshwater Sciences, where a limited number of journalists were invited on the tour, which was followed by a press avail. (*Id.* ¶ 10.)

One way members of the media are notified of these types of events is via the Governor's media advisory email list. (*Id.* ¶¶ 13–14.) After receiving email notification of limited-access events, those who wish to attend must RSVP so that the Governor's Office, including security personnel, can plan and prepare for the event. (*Id.* ¶ 14.) Depending on the type of event, the Governor's Office may reach out directly to members of the press from a specific area of the state or to those interested in specific subject matter. (*Id.* ¶ 15.) For some events, state agencies, elected officials, or organizations may handle invitations and attendance. (*Id.* ¶ 16.)

The Governor's current media advisory list is comprised of journalists and news organizations that meet criteria which focus on whether the

requestor is a bona fide press organization. (*Id.* at ¶¶ 17–20.) The list includes numerous bona fide media outlets, some of which are perceived as "conservative leaning," such as the Washington Times, Wall Street Journal, and Fox News, as well as others perceived as "liberal leaning," such as the Capitol Times, the New York Times, and the Huffington Post. (*Id.* ¶ 20.)

### C.   Press briefings.

The Governor or his staff also occasionally hold a smaller type of limited access press event called a press briefing. (*Id.* ¶ 29.) The Governor's Office has historically held press briefings as a courtesy to members of the press so that they have additional background before the release of large-scale initiatives. (*Id.*) These are off-the-record events, which means that the information provided is not intended for public release or as an official representation or statement. (*Id.*) Thus, some materials provided at this type of event might be subject to embargoes (which are requests that provided information will not be made public until a designated time). (*Id.* ¶ 27.)

As an example, the February 28, 2019, briefing was an invitation-only event for a small group of journalists where the State Budget Office previewed the Governor's 2019-2020 Executive Budget in advance of public release so that invited journalists could provide comprehensive press coverage contemporaneously with the budget's public release. (*Id.* ¶ 31.) The media advisory list was not used to issue invitations to this event. (*Id.* ¶ 32.) The

Governor did not attend this event. (*Id*. ¶ 31.) MacIver Institute was not invited to this event so they were not permitted to attend. (*Id*. ¶ 37.) Other individuals and groups were not permitted to attend for that same reason. (*Id*. ¶ 38.) For example, Jason Stein, a journalist formerly with the Milwaukee Journal Sentinel and Wisconsin State Journal, was denied admission because he is no longer affiliated with one of those invited organizations, is no longer working as a journalist, and is instead working for the Wisconsin Policy Forum. (*Id*.)

Invitations for press briefings like the one held on February 28, 2019, would not go out via the media advisory list. (*Id*. ¶ 32.) While there have not been any similar briefings since the February briefing, if the Governor's Office were to host future briefings, invitees would not only have to meet the guidelines in the media advisory list; their organization would also have to have a readership or viewership justifying inclusion. (*Id*. ¶¶ 33–34.) For example, media outlets that routinely cover capitol matters, including outlets that are on the Capitol Correspondents list, may be included. (*Id*. ¶ 35.) The Governor's Office might also consider additional factors, such as subject-matter specialty. (*Id*. ¶ 34.)

### D.    One-on-one interviews.

Finally, the Governor sometimes grants a face-to-face interview with a reporter, just as he or members of his staff may have meetings with individual

members of the public, advocacy organizations, and even registered lobbyists. (*Id.* ¶ 39.) Meetings with individual reporters are subject to the expectation that the interview will adhere to established journalistic standards, including respecting embargoes and preserving the distinction between on- and off-the-record statements. (*Id.*)

## II.   MacIver's complaint and motion for preliminary injunction.

On August 6, 2019, MacIver filed this action under 42 U.S.C. § 1983, alleging violation of the First and Fourteenth Amendments. It seeks declaratory and injunctive relief. (Dkt. 1.)

On August 20, 2019, MacIver filed the present motion for preliminary injunction and supporting materials. (Dkt. 6–9.) MacIver seeks to enjoin Governor Evers from excluding MacIver journalists from "generally available press briefings and events and lists announcing such events." (Dkt. 6:1.) MacIver does not explain what it means by "generally available press briefings," but it appears to refer to limited access press events like the press conferences and briefings described above. (Dkt. 1:9–10; 11:3–5 ¶¶ 13–23.)

### PRELIMINARY INJUNCTION LEGAL STANDARD

A preliminary injunction is an extraordinary and drastic remedy and is never awarded as a matter of right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Boucher v. Sch. Bd. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). "[A]n injunction requiring an affirmative act by the defendant" must be

"cautiously viewed" and granted only "sparingly." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (citation omitted). "Preliminary relief is properly sought only to avert irreparable harm to the moving party." *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 944 (7th Cir. 2006).

A "moving party must show that it has '(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits.'" *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (citation omitted); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "For preliminary relief to be granted, the irreparable harm must . . . be likely. That is, there must be more than a mere possibility that the harm will come to pass . . . ." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011).

Only if the moving party shows a likelihood of success on the merits and irreparable harm if the injunction does not issue, then "the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Wis. Right to Life*, 751 F.3d at 830 (citation omitted). "The 'equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor.'" *Id.* (citation omitted).

A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Granting a

preliminary injunction involves the "exercise of a very far-reaching power" and is "never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citations omitted).

## ARGUMENT

### I.   MacIver cannot show that it will suffer irreparable harm without a preliminary injunction.

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* Without proving irreparable harm, the court need not decide any other question. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 19 & n.6 (7th Cir. 1992) (plaintiff's failure to demonstrate irreparable harm "dooms a plaintiff's case and renders moot any further inquiry").

MacIver has proposed no facts showing irreparable harm. (Dkt. 11.) MacIver just asserts that it will face irreparable harm because, when denied access to some of the Governor's events, its "ability to report important news is substantially compromised." (Dkt. 7:7.) MacIver claims that its "journalists must rely on others' reporting and after-the-fact press releases to know the

Governor's activities" and when it is excluded from certain events, it is prevented from "asking the Governor questions about stories they are reporting on or the news he is making at these stops." (Dkt. 7:7.)

MacIver does not argue that its journalists will be unable to report on news relating to Governor Evers absent an injunction. It simply argues that it will have to work harder to gather news and break stories relating to Governor Evers. (Dkt. 7:7.) Even if this were true, it does not rise to the level of irreparable harm. As discussed below in the First Amendment inquiry, MacIver's alleged injury—being "prevent[ed] . . . from asking the Governor questions about stories they are reporting on or the news he is making" (Dkt. 7:7)—simply is not a cognizable First Amendment injury. *See Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 946–47 (7th Cir. 2015) (rejecting First Amendment claim challenging access-limitation on government records, since access to public records "is not part of the 'freedom of speech' that the first amendment protects" (quoting *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998)).

What's more, MacIver has not identified a single upcoming event that it will not be permitted to attend, much less that it would be irreparably harmed if it cannot attend. The fact that MacIver was excluded from an event in the past does not demonstrate irreparable harm because the purpose of a preliminary injunction is not to remedy past harm, but to protect plaintiffs

from future harm. *See Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1267 (10th Cir. 2005) ("The purpose of a preliminary junction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance."). MacIver's speculation that it will be excluded from some unidentified future event does not demonstrate irreparable harm. Because of this failure, MacIver cannot meet its burden and its motion for a preliminary injunction must be denied.

## II.   MacIver cannot show that it is likely to prevail on the merits of its constitutional claims.

MacIver's three constitutional claims rest on the theory that any time government permits access to some news organizations, it is obligated to permit equal access to all news organizations. There is no legal support for this position. Governor Evers is free to restrict access to certain events, so long as the restriction is reasonable and viewpoint neutral.

### A.   MacIver cannot show that it is likely to prevail on its First Amendment equal access claim.

MacIver seeks equal access to certain press events and to lists announcing those events. Whether Governor Evers is required to provide equal access is determined by analyzing the forum at issue. The type of press event MacIver would like to attend is a nonpublic forum, from which the Governor can restrict access so long as the restriction is reasonable and viewpoint neutral.

1.   **The type of forum at issue determines the applicable level of scrutiny for any governmental limits on access.**

"The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally. The Constitution does no more than assure the public and the press equal access once government has opened its doors." *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (Stewart, J., concurring) (describing majority opinion and agreeing substantially with it); *see also id*. at 15–16. The extent to which the government "opens its doors"—or creates a forum—determines whether equal access is required.

There are three types of forums: the traditional public forum, the public forum created by government designation, and the nonpublic forum. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Traditional public forums include streets, sidewalks, parks, and other property that by tradition has been "devoted to assembly and debate." *Id*. (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Designated public forums are "public property which the state has opened for use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45. Granting access to one individual, or even several individuals or groups, is not sufficient to show

that the government intended to designate a public forum. *Forbes*, 523 U.S. at 678. To create a public forum, "the government must intend to make the property 'generally available.'" *Id.* (citation omitted). "A designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *Id.* at 679.

All other contexts are either nonpublic forums or not forums at all. *Id.* at 677. For example, nonpublic forums have been found in the context of a televised presidential debate on a state-owned public television station, *see Forbes*, 523 U.S. at 680; an internal school mail system, *see Perry*, 460 U.S. at 48; and a charity drive created by the federal government for federal employees, *see Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 805 (1985).

In traditional and designated public forums, speech is protected by strict scrutiny. The government can exclude speakers from these forums "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* (citation omitted).

Access to a nonpublic forum, in contrast, is subject to rational basis review. The government can restrict access to a nonpublic forum "as long as the restrictions are reasonable and [are] not an effort to suppress expression

merely because public officials oppose the speaker's view." *Forbes*, 523 U.S. at 677–78 (alteration in original) (citation omitted). In contrast, in non-forums, like phone calls, exclusive interviews, or other more interactive contexts, the government *may* make content-based distinctions between reporters. *See Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 413 (4th Cir. 2006) (upholding governor's decision to prohibit executive agencies from speaking with two reporters); *Snyder v. Ringgold*, No. 97-1358, 1998 WL 13528, at *4 (4th Cir. Jan. 15, 1998) (per curiam) (public official who refused exclusive interview entitled to qualified immunity).

> ## 2. The press events at issue are nonpublic forums, so any access limitations are subject to rational-basis review.

MacIver seeks admission to limited access press events, like press conferences and briefings. (Dkt. 1:9–10; 11:3–5 ¶¶ 13–23.) These types of selective access events are nonpublic forums and access criteria is subject to rational basis review. *Cf. Forbes*, 523 U.S. at 680 (presidential debate on state-owned media); *Perry*, 460 U.S. at 48 (school mail system); *Cornelius*, 473 U.S. at 805 (government-sponsored charity drive).

MacIver does not address the forum question. Instead, it seems to suggest that the type of press conference from which it was excluded, and may allegedly be excluded in the future, is a designated public forum where access

is protected by strict scrutiny. MacIver cites *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977), for the proposition that "[t]he First Amendment's freedom of the press clause includes a right of equal access for all journalists to information or events made generally available to the press corps" and that such a right is "protected by strict scrutiny." (Dkt. 7:9.) But the holding in *Sherrill* was not so broad. The only question in *Sherrill* was whether the Secret Service had permissibly denied a press pass to a journalist who the parties agreed was otherwise eligible to receive it. *Sherrill*, 569 F.2d at 129.

Here, in contrast, the press conferences and briefings to which MacIver seeks access are open to only a select group of invited journalists who meet the criteria for bona fide press organizations. (Baldauff Decl. ¶¶ 9–20, 30–38.) As discussed below, MacIver does not meet those criteria and therefore is not "otherwise eligible" to attend press conferences and briefings. In keeping with the appropriate forum inquiry, these selective access events are nonpublic forums, and the Governor is therefore free to exclude other individuals and organizations so long as the exclusion is reasonable and viewpoint neutral. *See Forbes*, 523 U.S. at 677–78.

### 3. The limits the Governor has placed on press access to certain events are reasonable and viewpoint neutral.

It is not possible or practical to allow every media outlet to attend every press event. (Baldauff Decl. ¶¶ 11–12.) Indeed, access limitations are not

16

optional—space at these kinds of events is not unlimited, and so not everyone may attend. Thus, it necessarily follows that it is reasonable to limit attendance.

In addition to space considerations, when determining whether a media organization or individual will be granted access to a nonpublic event, Governor Evers considers several criteria aimed at determining whether the group is a bona fide news organization. For example, the individual seeking access must be "employed by or affiliated with an organization whose principal business is news dissemination" and the parent news organization must have "published news continuously for at least 18 months" and have a "periodical publication component or an established television or radio presence." (*Id*. ¶ 18; Ex. 1.) Further, the organization must, among other requirements, "avoid real or perceived conflicts of interest," "resist pressures from advertisers, donors, or any other special interests to influence coverage," and not engage in any "lobbying, paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation or organization." (*Id*.)

Along with the practical necessity of such limiting principles, the Governor's criteria are reasonable because, for example, bona fide journalists are more likely to adhere to widely recognized professional standards, such as honoring embargoes (which are requests that provided information will not be made public until a designated time) and respecting the distinction between

off-the-record and on-the-record communications. (*Id.* ¶ 27.) And the factors are viewpoint neutral because they do not discriminate based on whether an individual or organization is, for example, "liberal leaning" or "conservative leaning"; they are simply intended to determine whether the requester is a bona fide news organization, whose principal business is news dissemination, not public policy advocacy. (*Id.* ¶¶ 18, 20; Ex. 1.) The criteria therefore sweep in a wide variety of new organizations and journalists from across the state and nation. Moreover, organizations that meet these criteria often have wide viewership or readership, so that providing access to journalists from those organizations maximizes the public's access to newsworthy information. (*See id.* ¶¶ 34–35; Ex. 1.)

The Governor's Office has a reasonable basis for concluding that MacIver does not meet the criteria for a bona fide press organization. (*Id.* ¶¶ 21–26.) The MacIver Institute is not principally a news organization. On its website, it characterizes itself as "a Wisconsin-based think tank that promotes free markets, individual freedom, personal responsibility and limited government." (*Id.* ¶ 23.) Likewise, the organization engages in policy-driven political advocacy, including advocating for specific initiatives and policy approaches. (*See id.* ¶¶ 23–25.) The organization's "news" branch makes no effort to distinguish itself from the overall organization mission. (*Id.* ¶ 23.) MacIver is therefore not included on the media advisory list because it is not a bona fide

press organization. For this reason, it is not eligible to attend limited-access press events and was properly excluded.

### B. MacIver cannot show that it is likely to prevail on its First Amendment viewpoint discrimination claim.

In addition to its equal access claim, MacIver argues that Governor Evers has restricted its access to certain events because of MacIver's viewpoint. (Dkt. 7:11–15.) MacIver has presented no evidence to support this assertion.

If the event in question is a forum—public or nonpublic—viewpoint discrimination is not permitted by the government. *Forbes*, 523 U.S. at 677–78, 682. "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806 (citations omitted). Put another way, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citation omitted).

There is no evidence of viewpoint discrimination here. MacIver claims that Governor Evers excluded it from press events and the media advisory list

because he disagrees with its "conservative or free-market" viewpoint. (Dkt. 7:12.) MacIver has presented no facts to support this assertion. There is no evidence that Governor Evers excluded MacIver from past events, or will exclude it from future events, "solely to suppress" its viewpoint. *See Cornelius*, 473 U.S. at 806. To the contrary, the criteria that Governor Evers uses in determining access to nonpublic events are viewpoint neutral and allow access to news outlets perceived as having widely divergent ideological views. (Baldauff Decl. ¶¶ 18, 20; Ex. 1.) Individuals or organizations that are not bona fide press may be excluded from events on that basis, regardless of whether they express any viewpoint. (*Id*. ¶ 20.)

### C.   MacIver cannot show that it is likely to prevail on its Fourteenth Amendment equal protection claim.

Finally, MacIver argues that the Governor has violated its right to equal protection by granting access to some news organizations, while denying access to MacIver. (Dkt. 7:15–16.) This claim effectively repackages the First Amendment claims (*see* Dkt. 7:15–16), and should therefore be disregarded. *Cf. Graham v. Connor*, 490 U.S. 386, 394 (1989) (in context of excessive force claim, holding that constitutional claims must "be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized . . . standard").

If the Court were to reach this claim, it would be subject to rational basis review. The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The guarantee of equal protection . . . [is] a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448 U.S. 297, 322 (1980). "[It] does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

When reviewing a claim that state action violates equal protection, a court must first determine the applicable level of scrutiny. *See Dunn v. Blumstein*, 405 U.S. 330, 335 (1972). State action that does not target a suspect class or infringe on a fundamental right will be upheld if it bears a rational relation to some legitimate end. *Turkhan v. Perryman*, 188 F.3d 814, 828 (7th Cir. 1999). This level of review is exceedingly deferential: "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993).

MacIver's equal protection claim is appropriately reviewed under the rational basis standard. No fundamental right or suspect class is at issue in this case. As discussed above, MacIver has no First Amendment right to attend

21

an event, or to be included on a list announcing such an event, simply because other press organizations are allowed such access. And MacIver's reliance on *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 15 (S.D. Iowa 1971), is unpersuasive because the court there applied strict scrutiny to the plaintiff's equal protection claim only after concluding that that level of scrutiny applied to the First Amendment claim. Here, in contrast, rational basis review applies to the First Amendment claims so it follows that is also applies to the equal protection claim.

As discussed above, the limits the Governor has placed on access to certain events are reasonable and viewpoint neutral. Space at every event is necessarily limited, and it is reasonable to apply the established criteria for bona fide journalists to determine access to those events. Because MacIver does not satisfy those criteria, it cannot demonstrate that it is likely to succeed on its equal protection claim.

## III. The balance of harms further supports denying the preliminary injunction.

Given that MacIver cannot show irreparable harm or any likelihood of success, this Court need not reach the balance-of-harms inquiry. If the Court were to reach that question, the balance further favors denying the requested relief.

To begin, MacIver makes no showing of what its harms would be absent an injunction. (*See* Dkt. 7:16–17.) In support of its harms argument, MacIver simply quotes the *Consumers Union* case, without any factual allegations about why MacIver, specifically, would be harmed. (Dkt. 7:16.) Accepting MacIver's broad notion of harm, any individual or entity that seeks press access would be entitled to an injunction.

But such broad relief corresponds directly to the harms that Governor Evers and the public would suffer if MacIver were entitled to an injunction. If this Court were to require the Governor to grant access to MacIver, there would be no limiting principle by which press access could be confined. This would translate into either an unwieldy situation of unrestricted media access at every event or, more likely, no press events at all. Either scenario would severely harm the Governor and the public, as both options would impair the timely, effective dissemination of press-worthy information.

The balance of harms therefore further supports denying the preliminary injunction request.

## CONCLUSION

Defendant respectfully requests that this Court deny Plaintiffs' motion for a preliminary injunction.

Dated this 17th day of September, 2019.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General
State Bar #1084731

KARLA Z. KECKHAVER
Assistant Attorney General
State Bar #1028242

Attorneys for Defendant

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8904 (GJK)
(608) 264-6365 (KZK)
(608) 267-2223 (Fax)
johnsonkarpg@doj.state.wi.us
keckhaverkz@doj.state.wi.us

## CERTIFICATE OF SERVICE

I certify that on September 17, 2019, I electronically filed the foregoing Defendant's Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

Dated this 17th day of September, 2019.


s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General