# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JOHN K. MACIVER INSTITUTE FOR PUBLIC POLICY, et al. | |
| Plaintiffs, | No. 3:19-cv-00649-JDP-SLC |
| v. | |
| TONY EVERS, in his official capacity as Governor of Wisconsin, | |
| Defendant. | |

## REPLY BRIEF ON MOTION FOR PRELIMINARY INJUNCTION

### I.     Plaintiffs have shown irreparable harm.

Defendant says that Plaintiffs have not shown irreparable harm for two reasons. First, he says, Plaintiffs are not prevented from reporting the news, the ban simply makes their job harder. (Def. Memo. of Law at 11). Making a reporter's job harder is a real First Amendment burden. *See Huminski v. Corsones*, 386 F.3d 116, 146 (2d Cir. 2004); *United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1374 (S.D. Fla. 2002). Plus, this misunderstands MacIver's claim. MacIver's claim is not that the Defendant's ban prevents them from reporting any news at all (this is not a case alleging prior restraint), but that the ban prevents them from attending the Governor's press events. The denial of equal access is the harm.

Defendant also points out that "MacIver has not identified a single upcoming event that it will not be permitted to attend." (Def. Memo. of Law at 11). This is true. MacIver has asserted that the Defendant "regularly holds press conferences to answer questions from news media," and Defendant does not dispute this. (Doc. 16, #11). MacIver cannot name a *particular* upcoming news

conference precisely because the Defendant excludes it from the media-advisory list whereby such events are announced ahead-of-time.

## II.     MacIver is likely to succeed on its First and Fourteenth Amendment claims.

### A.     *MacIver is likely to succeed on its equal-access claim.*

      1.     Forum analysis is not the proper lens through which to view this case.

The Defendant asserts that press access should be evaluated through the lens of a First Amendment forum analysis (Def. Memo. of Law at 12). This is the wrong doctrine to apply to this case. Forum analysis is a free-speech doctrine used to determine when an outside speaker may speak on government property. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 799-800 (1985). MacIver's first count brings not a speech claim but a freedom-of-the-press claim for equal treatment amongst-and-between journalists. Forum analysis is simply inapposite to this claim. Which is why Plaintiffs never discussed forum analysis in their opening brief: because the press-access cases that Plaintiffs cited do not go about their legal analysis using this doctrine.

Rather, courts assume a right to equal access among journalists, and apply strict scrutiny when the government presumes to discriminate among journalists. (Contra Def. Memo. of Law at 14). Thus, *Sherrill v. Knight*: "White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that this access not be denied arbitrarily or for less than compelling reasons." 569 F.2d 124, 129 (D.C. Cir. 1977); *id*. at 130 ("refusal must be based on a compelling governmental interest."). The D.C. District Court in the same case below specified not only the need for a compelling interest, but also the requirement of narrow tailoring. *Forcade v. Knight*, 416 F. Supp. 1025, 1035 (D.D.C. 1976). This is how this Court should approach

MacIver's first claim: by presuming a right of equal access, and then asking whether the government can show a compelling reason for denying equal access to these particular journalists.

2.   The Defendant's new argument from neutral criteria does not pass muster.

Defendant first asserts that "access limitations are not optional—space at these kinds of events is not unlimited, and so not everyone may attend. Thus, it necessarily follows that it is reasonable to limit attendance." (Def. Memo. of Law at 16-17). There are certainly instances where government may use neutral criteria to allocate limited physical space at events; there are only so many seats on Air Force One. (Pl.'s Memo. of Law at 10). But this is not such an instance. Defendant previously sent media advisories out to over 1,000 recipients (Doc. 7-1). Defendant now provides a new media advisory list which he has combed through based on his new neutral criteria, and with the Democratic staffers and left-wing activists and others scrubbed, the list still runs to over 780 recipients (Doc. 15-2). If all 780 recipients are invited to attend every press conference or event, then there is no reason to assume the attendance of a 781st recipient from MacIver will bring down the wrath of the fire marshal.

The heart of the Defendant's argument is that he now has new, detailed neutral criteria to determine which press are permitted access to this list and correspondingly to generally available press events. (Doc. 15-1). This Court should not let the Defendant's shifting of the goalposts stand, especially given the nature and application of these new criteria.

First, these neutral criteria represent a substantial change from the Defendant's previous position. Defendant's chief legal counsel informed MacIver's counsel on April 19, 2019, that Defendant's communication's office "invites some journalists to limited access events, such as exclusive interviews, on a case-by-case basis using neutral criteria, namely newspaper circulation, radio listenership, and TV viewership." (Doc. 7-5). This wording suggests that only exclusive

interviews, and not general press conferences, were subject to a circulation-based neutral-criteria analysis. Plaintiff subsequently filed a public-records request for any document setting forth the neutral criteria used by the Defendant's staff. (Doc. 7-6). The Defendant's staff denied access to any such documents based on attorney-client privilege. (Doc. 17-1). Denying a press credential without making available the criteria on which that denial is based is itself a problem under the First Amendment. *Getty Images News Servs. v. DOD*, 193 F. Supp. 2d 112, 121 (D.D.C. 2002); *Quad-City Community News Service, Inc. v. Jebens*, 334 F. Supp. 8, 17 (S.D. Iowa 1971).

The Defendant now provides a memorandum dated June 26, 2019, from the Governor's Office of Legal Counsel, Doc. 15-1. The neutral criteria set forth in that memorandum include numerous factors unrelated to circulation (the criterion set forth in the April 19 letter), and it is these new factors that are the basis for the Defendant's denial of MacIver's access. Moreover, the Defendant states that he uses these criteria not for "limited access events, such as exclusive interviews," as had been stated previously, but for all press-access questions. (Def. Memo. of Law. at 12).

These criteria, which were heretofore private and were contrived after MacIver's initial demand letter and exchange of documents, quite conveniently vindicate the Defendant's previous position excluding MacIver. According to Defendant, the criteria are based on a blend of the criteria set by the U.S. Congress and the Wisconsin State Legislature. (Doc. 15, ¶ 18). If the Defendant had simply adopted the criteria set by the Wisconsin State Legislature, then MacIver should have been admitted, because MacIver's journalists are credentialed by the Legislature, (Doc. 9, ¶ 7), and Defendant knew this fact at the time he made the new criteria. (Doc. 7-4). Thus, in order to vindicate his previous decision to exclude MacIver, Defendant relies on factors found in the congressional criteria. The Court should be deeply skeptical of this convenient conclusion.

4

Second, the Defendant does not apply these criteria fairly or honestly to the list he now uses. (Doc. 15-2). The newly provided media list includes reporters employed by entities that are actually registered to lobby. For instance, the list includes the editors of *Kalihwisaks* and the *Menominee Nation News*, the official newspapers of the Oneida Nation and Menominee Indian Tribe. The Oneida and Menominee are both are registered to lobby in Wisconsin. *See* Wis. Ethics Commission, lobbying.wi.gov. The list includes reporters for WUWM, the public radio station by UW-Milwaukee, and Wisconsin Public Television (WPT), which is a service of the UW Board of Regents. The UW retains legislative liaisons who engage in paid advocacy on its behalf. *Id*.

Though these entities actually lobby, many other news outlets engage in "lobbying activity" or "political advocacy" if those terms are defined as broadly as they have been applied to MacIver. (*See, e.g.,* Doc. 15, ¶ 24). Any news outlet that has an editorial page could be disqualified under such a broad standard for "lobbying" or "political advocacy." The *Milwaukee Journal Sentinel* and *Wisconsin State Journal* run editorials endorsing candidates—does this not constitute "promotion" for individuals or political parties? *See, e.g.*, "Editorial: First, say no to Donald Trump," Milw. J. Sentinel (Nov. 4, 2016) (reluctantly endorsing Hillary Clinton for president). They also regularly "advocate[e] for specific initiatives and policy approaches" (Def. Memo. of Law at 18) on their editorial pages. *See, e.g.,* Editorial, "Good start on helping the homeless," Wis. State J. (Nov. 28, 2018) (endorsing state budgetary proposal to fund homelessness efforts). Plus, the Defendant's new media list includes not only "hard-news" reporters, but also a number of opinion-journalists, columnists, and radio-show hosts who endorse causes, candidates, or legislation.

And if the employing entity must have as its "principal business . . . news dissemination" (Doc. 15-1, #1), then any broadcast TV station besides CNN and any radio station besides pure news/talk should be off the list. Turn on your local NBC, ABC, or CBS affiliate at any particular hour of the

day or night, and one is more likely to find Judge Judy, Seinfeld reruns, or a Brewers game on the screen than a news program. Tune in to the radio stations represented by the first two email addresses on the new media list, and you will hear not news but the classic hits of yesteryear.

The foregoing paragraphs show that these neutral criteria are really "factors" that the Governor's press staff consider, not hard-and-fast rules. (*See* Doc. 15, ¶ 22 and Doc. 15-1). The staff apparently look at all the factors holistically, weigh them "based on [their] experience with media and politics," and then arrive at judgment calls as to which reporters or outlets engage in "too much" advocacy or "not enough" news dissemination. This reduces, then, to MacIver's original complaint: that the Defendant's staff are deciding who gets press access based on their own judgments of which outlets they deem worthy. (Pl.'s Memo. of Law, at 13-14). Such subjective determinations permit too much room for viewpoint discrimination and retaliation.

Third, the factors themselves as they are applied are deeply problematic. Important news publications are now collateral damage of Defendant's quest to justify its exclusion of MacIver. The *Wisconsin Jewish Chronicle* is published by the Milwaukee Jewish Federation on a monthly basis, with more frequent online content. Last session the Federation was a registered lobbyist. The *Chronicle* was on the old media list, but is not on the new one. (Compare Doc. 7-1 with Doc. 15-2). The *Catholic Herald* is the weekly newspaper of the Archdiocese of Milwaukee. Its publisher also engages in advocacy around issues from poverty to pro-life. It is credentialed to cover the Legislature, but is not on the Defendant's list, and would not meet the new criteria. These publications, and likely others, employ journalists and serve numerous news consumers, but will be excluded from the Defendant's press conferences based on these new criteria.

And the factors as applied to MacIver are based on mischaracterizations of its work. MacIver does not hide its free-market mission. (Doc. 16, #2). But that does not make it partisan (Contra

Doc. 16, #1); the policy staff at the Institute are critical of Republicans when they fail to follow free-market principles just as much as when Democrats do (for instance, criticizing Governor Walker or GOP legislative leaders on the Bucks Arena, the Kimberly-Clark deal, proposed changes to the public-records law, and budget spending decisions). The fact that one time a MacIver reporter participated in a panel discussion on the news media at a political party event does not make it partisan. Hosts from WISN-1130 and WIBA-1310 were also on the panel, but their employer retains its place on the media list. John Nichols of *The Nation* kept his place on the list, even though he has been a past speaker for the Democratic Parties of Sheboygan County, Door County, and Dane County, and for Grassroots Northshore, a PAC which charged $20 to hear him speak on "How We Win." And MacIver is not and never has never been registered to lobby. (Doc. 16-4). Nor has it nor could it endorse candidates given its charitable tax status. But Defendant never gave MacIver an opportunity to explain any of this. *See Getty Images News Servs*., 193 F. Supp. 2d at 121 (government should "provide a way for applicant media organizations to submit information demonstrating that they satisfy the criteria"). Defendant simply jumbled the factors together, considered their "experience in media and politics," and denied MacIver access.

Defendant also apparently skipped the factor, "Is the petitioner a bona fide correspondent of repute in their profession?" (Doc. 15-1, # 4). MacIver's news director is a member of the Society of Professional Journalists (Doc. 8, ¶ 1) who won several press association awards in previous jobs (Doc. 8, ¶ 3). MacIver's former investigative reporter Matt Kittle, who was on staff at the time of the incidents in the complaint, won multiple press association awards in his previous job at a Missouri newspaper. *See* Missouri Press Assn., https://mopress.com/ap-media-editor-awards/. MacIver's reporters won an award in 2018 from the Milwaukee Press Club for their hard-news reporting. (*Id*.). The MacIver journalists attempted to attend the February budget briefing in the

first place because of a tip to do so from another journalist. (*Id*. at ¶ 7). MacIver is credentialed by the Wisconsin State Legislature. (Doc. 9, ¶ 7). And MacIver reporters regularly break statewide stories before other media outlets. *See, e.g.*, Patrick Marley, "Eleven members of Gov. Tony Evers' cabinet are making 10 percent or more over Scott Walker's appointees," Milw. J. Sentinel (March 5, 2019) (crediting MacIver with first reporting substantial pay bumps for cabinet secretaries). All of this should have added up to the conclusion that other members of the press corps recognize the quality reporting done by MacIver's journalists.

The Defendant's submissions place great weight on the fact that MacIver's journalists are employed by a "think tank." (Def. Memo. of Law at 19; Doc. 15, ¶ 23). The fact that the MacIver journalists are affiliated with a think tank should be no bar to their access. This is not an unusual arrangement, especially as non-profit journalism becomes more prevalent. *See, e.g.*, Stateline from the Pew Charitable Trusts (https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/about) and the Daily Signal from the Heritage Foundation (https://www.dailysignal.com/daily-signal/). As *The Economist* magazine reported: "Think tanks and journalism: The divide between having ideas and reporting on them is dissolving." "Making the Headlines," The Economist (Sept. 20, 2014).

This court should consider two previous cases similar to MacIver's situation. In the first, Congress denied press credentials to *Consumer Reports* magazine because it was affiliated with Consumers Union, "a nonprofit organization which is a self-proclaimed advocate of consumer interests and, among other activities, testifies before Congressional committees in behalf of the interests of consumers, as Consumers Union judges those interests." *Consumers Union of United States, Inc. v. Periodical Correspondents' Assoc.*, 365 F. Supp. 18, 22-23 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975). This the U.S. District Court for the District of

Columbia rejected, saying: "A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine." *Id*. Similarly, in *United Teachers of Dade*, 213 F. Supp. 2d at 1373, the school board attempted to exclude a union newspaper published by the local teachers' union based on the supposedly neutral criterion that they permitted only "general circulation" publications. The district court rejected this rationale. *See also Lewis v. Baxley*, 368 F. Supp. 768, 779 (M.D. Ala. 1973) (rejecting press-access policy that was based on fear of "lobbying newspapermen"). This Court should similarly reject this attempt to exclude the MacIver journalists because they are affiliated with a "think tank."

In sum, six months after deciding to exclude MacIver's journalists, and after receiving a demand letter flagging the issue, the Defendant's staff came up with supposedly neutral criteria that vindicated their original decision. The Legislature's criteria would not do to achieve that goal, so they blended the Legislature's criteria with those of Congress. But the new neutral criteria are no salvation: they were not developed openly, are not applied equally, do not permit an opportunity for journalists to show their bona fides, exclude legitimate news outlets besides MacIver, and violate the Constitution. This court should enjoin their application pending resolution of this case.

## III.   Plaintiffs have shown viewpoint discrimination.

It is true that there is no smoking gun email in Plaintiffs' possession at this stage in the litigation that says, "Those MacIver journalists are right-wing nut-jobs; we should exclude them." But viewpoint discrimination may be inferred from the facts. *Mesa v. White*, 197 F.3d 1041, 1047 (10th Cir. 1999). And here it should be. Though the list includes reporters from the *Washington Times*, Fox News, and the *Wall Street Journal* (*see* Doc. 15, ¶ 20), how likely is it that reporters from Washington or New York, or even a Chicago bureau, are going to regularly make their way up to

Madison for Defendant's press conferences? It is easy to include them on the list when the chances they show up and ask tough questions is extraordinarily small, whereas MacIver's journalists are across the street from the Capitol and regularly attend and ask questions at other elected officials' press conferences. The Court can reasonably infer viewpoint discrimination from these facts.

## IV.    MacIver should prevail on its equal-protection claim.

MacIver's equal-protection claim is based on a separate line of cases finding an equal-protection violation when government officials discriminate between news organizations. (Pl.'s Memo. of Law at 15-16, citing *McCoy v. Providence Journal Co.*, 190 F.2d 760, 766 (1st Cir. 1951) and *Quad-City Cmty. News Serv., Inc.*, 334 F. Supp. at 15). Defendant's response repackages its neutral-criteria argument: MacIver isn't a bona fide news organization, so *McCoy* and *Quad-Cities* don't fit. But the MacIver reporters are bona fide journalists, as evidenced by their careers, their awards, and their professional associations, and they are entitled to equal protection as such.

## CONCLUSION

MacIver has shown all of the elements necessary to receive a preliminary injunction, and the new neutral criteria at the heart of Defendant's argument fail to save him for numerous reasons.


Dated: September 25, 2019                    Respectfully Submitted,
Served via CM/ECF

                                             **JOHN K. MACIVER INSTITUTE FOR**
                                             **PUBLIC POLICY**

                                             **WILLIAM OSMULSKI**

                                             By:    /s/ *Daniel R. Suhr*

Daniel R. Suhr (WI State Bar #6321108, WDWI admission April 9, 2019)
Liberty Justice Center, 190 S. LaSalle St., Suite 1500, Chicago, Illinois 60603
Telephone (312) 263-7668 | dsuhr@libertyjusticecenter.org

*Attorney for Plaintiffs*