IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOHN K. MACIVER INSTITUTE FOR PUBLIC
POLICY and WILLIAM OSMULSKI,

                        Plaintiffs,

    v.                                   OPINION and ORDER

TONY EVERS, in his official capacity as Governor of       19-cv-649-jdp
the State of Wisconsin,

                        Defendant.

---

This case involves a dispute over credentials for press conferences held by Governor Tony Evers. Plaintiffs contend that they have a First Amendment right to press credentials, but that Evers withholds credentials because of plaintiffs' conservative viewpoint. Plaintiffs seek no damages; they ask only that the court order Evers to grant them access to his press conferences.

Plaintiffs moved for a preliminary injunction. Dkt. 6. The case calls for a straight-forward application of public forum doctrine, as articulated in *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37 (1983) and cases following it. An Evers press conference is a non-public forum, to which Evers may restrict access using reasonable, viewpoint-neutral criteria. After this suit was filed, Evers adopted press credentialing criteria based on those used by Congress and the Wisconsin Legislature. The court is not persuaded by plaintiff's argument that these criteria, or Evers's expressed interest in "fair and unbiased reporting," embody any viewpoint discrimination. Nor is the court persuaded that Evers has applied these criteria in a discriminatory way.

While the motion for preliminary injunction was under advisement, plaintiffs moved under Rule 65(a)(2) to consolidate the decision on the injunction with a decision on the merits, effectively converting the motion to one for summary judgment. Dkt. 28. Plaintiffs state that the material facts are undisputed; the court will grant the motion to consolidate. (Because the court is denying plaintiffs' request for an injunction, there is no prejudice to Evers, so there is no need to wait for a response from Evers on the motion to consolidate.) For reasons explained more fully below, plaintiffs' consolidated motion for preliminary injunction and for summary judgment is denied.

BACKGROUND

The following facts are drawn from plaintiffs' proposed findings of fact and Evers's responses to them, Dkt. 16, as well as from the parties' declarations and exhibits. Neither side has requested a hearing, and the material facts are not disputed.

The first plaintiff, the MacIver Institute, describes itself as "a Wisconsin-based think tank that promotes free markets, individual freedom, personal responsibility and limited government." Dkt. 9, ¶ 3. Plaintiffs provide little information about the activities of the MacIver Institute other than the MacIver News Service, which "investigates and reports on what is happening in state and local institutions of government across Wisconsin." *Id*. ¶ 4. The second plaintiff is William Osmulski, the news director for the MacIver Institute. Dkt. 8, ¶ 1. The president of the MacIver Institute, Brett Healy, describes it as "nonpartisan," but that is true only in the sense that it cannot lobby or expressly endorse political candidates without jeopardizing its non-profit status. Its website (at www.maciverinstitute.com), where its news reporting can be found, conveys consistently conservative political news and opinion

2

supportive of Republican politicians. The court will refer to the plaintiffs together as "MacIver," unless its necessary to identify them separately.

Tony Evers is the governor of Wisconsin, a Democrat elected in November 2018. Evers regularly participates in events where he answers questions from journalists. These events fall into four categories, described below in order of increasing exclusivity. *See also* Dkt. 15 (declaration from Evers's deputy chief of staff).

The first category consists of "public events." Public events are open to all members of the public, including journalists. Sometimes public events include a "press avail" component where Evers will answer questions from journalists. Evers does not restrict who attends public events, and MacIver does not object to Evers's handling of public events.

The second category consists of traditional "press conferences." Attendance at press conferences is necessarily limited for capacity and security. Journalists are typically informed of press conferences through the "media advisory email list" maintained by Evers's communication department. To attend a press conference, journalists on the media advisory email list must submit an RSVP to the communication department. MacIver's main objection in this case is that it is not included on the media advisory email list, and thus its journalists are not invited to press conferences.

The third category consists of "press briefings," which are off-the-record events to provide background on significant initiatives before they are announced to the public. Attendance at press briefings is by specific invitation only. Invitations go to a selected sub-set of the media advisory list—typically journalists who have a particularly substantial readership or viewership or a relevant subject matter specialty. (MacIver does not separately discuss press briefings in its motion for preliminary injunction, but the court assumes that MacIver believes

it is entitled to be on the media advisory list, and that as a result it would get some invitations to press briefings as well.)

The fourth category includes "one-on-one meetings" with journalists. MacIver acknowledges that Evers can grant exclusive interviews to specific journalists without violating the rights of other journalists. MacIver does not object to Evers's handling of one-on-one meetings with the press.

The dispute that led to this lawsuit arose shortly after Evers took office in January 2019. Osmulski requested that MacIver journalists be added to the media email advisory list, but Evers's staff didn't respond to the request. On February 28, the governor's office hosted an invitation-only press briefing to preview the 2019–2020 executive budget before its public release. Osmulski heard about the press briefing second-hand, and he emailed Evers's press staff to RSVP for himself and another MacIver journalist. But when Osmulski and his colleague arrived at the briefing, they were told that they weren't on the RSVP list and were turned away. Other journalists were also turned away that day.

Over the next few weeks, Osmulski complained, without success, to Evers's staff about being excluded from press conferences and press briefings. In May, counsel for MacIver made a public-records request for documents or communications related to any "neutral criteria the Communications Department of the Governor's Office uses to determine which journalists are allowed access to briefings or other events." Dkt. 7-6, at 2. The governor's office produced some responsive documents on June 20, but it withheld records that it considered privileged attorney-client communications, including records about its press-access criteria. Dkt. 17-1.

Six days later, on June 26, the governor's office of legal counsel circulated an internal memorandum to the communications department, providing "guidance for determining how

and when media is granted access to the Governor for exclusive/limited-access events." Dkt. 15-1, at 1. The media memorandum stated that the "most important consideration is that access is based on neutral criteria." It advised the communications staff that in response to requests for access, communication staff should consider the following non-exhaustive factors:

1. Is the petitioner employed by or affiliated with an organization whose principal business is news dissemination?

2. Does the parent news organization meet the following criteria?

    a. It has published news continuously for at least 18 months, and;

    b. It has a periodical publication component or an established television or radio presence.

3. Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with a Wisconsin high school, university, or college?

4. Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?

    a. Both avoid real or perceived conflicts of interest;

    b. Both are free of associations that would compromise journalistic integrity or damage credibility;

    c. Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and

    d. Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

5. Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation or organization?

5

*Id.* A footnote explained that the factors were drawn from the press-access standards used by the Wisconsin Capitol Correspondents Board and the United States Congress. *See id.* at 1, n.1.

Evers's original media advisory list was apparently based on the one used during his campaign for the governorship. In the months following the circulation of the media memorandum, the communications department made substantial changes to the media advisory email list to reflect the criteria. *Compare* Dkt. 7-1 (original list), *with* Dkt. 15-2 (current list). Recipients affiliated with the Democratic Party of Wisconsin and other political organizations were removed from the list.

The media memorandum was not made available to MacIver, so MacIver didn't know the basis for the administration's refusal to include its journalists on the list. In August, MacIver and Osmulski filed this suit, asserting claims under the First and Fourteenth Amendments and moving for a preliminary injunction. MacIver learned about the administration's media criteria and the updated media advisory email list for the first time when Evers included them with his brief in opposition to the motion for preliminary injunction. Evers says that MacIver journalists are excluded from the media advisory email list under its press-access criteria because MacIver is not principally a news organization. According to Evers, the MacIver Institute is a think tank with an affiliated news service that makes no effort to distinguish the work of the news service from the overall advocacy-focused mission of the think tank.

ANALYSIS

MacIver asserts three claims in its complaint: (1) a First Amendment equal-access claim premised on the theory that any denial of press access is subject to strict scrutiny; (2) a First Amendment viewpoint discrimination claim; and (3) a Fourteenth Amendment equal

protection claim. MacIver does not ask for damages; it seeks only declaratory and injunctive relief, including an injunction enjoining Evers from excluding MacIver journalists from press conferences and press briefings.

**A. Preliminary injunction and summary judgment standards**

The court evaluates MacIver's motion for preliminary injunction under the familiar two-part framework. First, the plaintiff must make three threshold showings: (1) it will suffer irreparable harm before a final resolution of the merits; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim. *HH-Indianapolis, LLC v. Consol. City of Indianapolis and Cty. of Marion*, 889 F.3d 432, 437 (7th Cir. 2018). Second, if the plaintiff makes the threshold showings, the court assesses the competing harms and the interests of the public in light of the plaintiff's chances of success. *Id.* Preliminary injunctions that require an affirmative act by the defendant, instead of merely restraining action, are "ordinarily cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (citation omitted).

Summary judgment is appropriate only if there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment will not be granted unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). The court agrees with MacIver that the material facts are undisputed, so it's efficient to consider the motion as one for

summary judgment. But, for the reasons that follow, the court concludes that MacIver is not entitled to judgment as a matter of law.

**B. Irreparable harm and adequacy of legal remedies**

MacIver contends that its journalists suffer irreparable harm every day that they are excluded from Evers's limited-access press events. Because they are excluded, MacIver journalists must rely on the reporting of others and on after-the-fact press releases to cover the Evers administration. They have no opportunity to ask questions at press conferences or briefings. These are types of First Amendment harms that have been deemed to be irreparable. *See Karem v. Trump*, No. CV 19-2514, 2019 WL 4169824, at *10 (D.D.C. Sept. 3, 2019) (temporary suspension of journalist's White House press pass "undoubtedly constitutes a concrete, unrecoverable harm sufficient to warrant preliminary relief"); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Traditional legal remedies would be inadequate. As in many cases involving restrictions on First Amendment rights, "the quantification of injury is difficult and damages are therefore not an adequate remedy." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (citations and internal quotation marks omitted); *see also Karem*, 2019 WL 4169824, at *10 ("[T]he only way to remedy the injury is to return the [press] pass and the access that comes with it").

In cases implicating the First Amendment, the plaintiff's "likelihood of success on the merits will often be the determinative factor." *Higher Soc'y of Indiana v. Tippecanoe Cty., Ind.*, 858 F.3d 1113, 1116 (7th Cir. 2017) (citation omitted). That's the case here. MacIver has made the requisite showings of irreparable harm and inadequacy of traditional legal remedies;

the court turns to the merits. The material facts are undisputed, so from this point on, the analysis of the motion for preliminary injunction coincides with the evaluation of the motion for summary judgment.

## C. Evaluation on the merits

### 1. Legal framework for press-access claims

Claims challenging government-imposed restrictions on access to government property or events have been generally governed by public forum doctrine, which establishes a framework for analyzing such restrictions based on the type of government property or event at issue. *See Perry Educ. Ass'n*, 460 U.S. at 44. "Traditional public forums," such as public streets or parks, are places open to anyone where citizens are traditionally free to speak without governmental approval or interference. Speakers cannot be excluded from a traditional public forum without a compelling government interest. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S 788, 800 (1985). A compelling government interest is also required to justify exclusions from "designated public forums," such as public theaters or other venues that the government has designated as a place for or a means of communication. *Id*. But in "nonpublic forums," access may be restricted "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (citations, quotation marks, and alterations omitted).

Public forum analysis has three steps. First, the court must decide whether the activity in which MacIver seeks to engage is protected by the First Amendment. *Cornelius*, 473 U.S. at 797. Here, there is no dispute that it is. *See Alvarez*, 679 F.3d at 597–600 ("[T]he First Amendment provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of the government").

Second, the court must assess whether the forum at issue is public or nonpublic, to determine the appropriate level of constitutional scrutiny. *Cornelius*, 473 U.S. at 800. Evers contends that his press conferences and press briefings are nonpublic forums because he makes them available only to the select journalists who meet his access criteria. MacIver doesn't address this question. MacIver does not argue that the court should consider Evers's press events to be "designated public forums" that Evers has "opened up for expressive activity by part or all of the public." *International Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). Evers's limited-access press events do not qualify as designated public forums under the Supreme Court's definition. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) ("A designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers."). So the court concludes that Evers's limited-access press conferences and press briefings are nonpublic forums.

At the third step of the public forum analysis, the court must assess the access restrictions under the appropriate level of scrutiny, in this case the standard applicable to nonpublic forums. For a nonpublic forum, the question is whether the restrictions are (1) reasonable and (2) not an effort to suppress an opposing viewpoint. *Cornelius*, 473 U.S. at 800.

With that general framework in mind, the court turns to MacIver's three constitutional claims.

### 2. MacIver's First Amendment equal-access claim

MacIver says that the First Amendment's free press clause "includes a right of equal access for all journalists to information or events made generally available to the press corps." Dkt. 7, at 9.

MacIver contends that public forum analysis is relevant only for determining when a "speaker may speak" on government property, not for questions about press access, which MacIver says are always subject to strict scrutiny. Dkt. 19, at 2. For this proposition MacIver relies principally on *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977). *Sherrill* involved a correspondent for *The Nation* magazine who was denied a White House press pass for unspecified reasons, which were later identified as related to security. The court concluded that the denial of a press pass to a bona fide Washington correspondent must be based on a compelling government interest, and that it would require notice, an opportunity to rebut, and a written decision. *Id*. at 130. The analysis in *Sherrill* did not invoke public forum doctrine, but that isn't surprising because *Sherrill* predates *Cornelius* and *Perry*, the cases that established modern forum doctrine. In any case, the *Sherrill* court did *not* hold that governmental press-credentialing is subject to strict scrutiny. To the contrary, the court concluded that the Constitution did not require "the articulation of detailed criteria upon which the granting or denial of White House press passes is to be based." *Id*. at 128. MacIver doesn't cite any more recent authority for its contention that press-credentialing is subject to strict scrutiny.

Contrary to MacIver's central argument, courts now routinely analyze press-access issues under public forum doctrine following *Cornelius* and *Perry*. *See, e.g.*, *Youngstown Pub. Co. v. McKelvey*, No. 4:05 CV 00625, 2005 WL 1153996, at *6 (N.D. Ohio May 16, 2005) (applying public forum doctrine in newspaper's challenge to mayor's policy forbidding city

employees from speaking with newspaper's reporters), *opinion vacated on other grounds, appeal dismissed sub nom. Youngstown Publ'g Co. v. McKelvey*, 189 F. App'x 402 (6th Cir. 2006); *Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1101–02 (C.D. Cal. 2003) (applying public forum doctrine in analyzing denial of equal access to a television broadcast corporation seeking to broadcast a public ceremony); *Getty Images New Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 119 (D.D.C. 2002) (applying public forum doctrine in analyzing photojournalism company's claim that the government had denied it equal access to the detention facilities at Guantanamo Bay).

The court concludes that MacIver is not likely to prevail on its First Amendment equal access claim and is not entitled to summary judgment on that claim.

### 3. First Amendment viewpoint discrimination claim

Properly framed, MacIver's First Amendment claim is that it is a victim of viewpoint discrimination. This calls for an evaluation of restrictions placed on a non-public forum, so the question is whether Evers's press-credentialing process is (1) reasonable and (2) viewpoint neutral.

#### a. Reasonableness of press credential criteria

The government may restrict access to a non-public forum on the basis of "subject matter and speaker identity" so long as the restrictions are consistent with the purpose of the forum and do not discriminate on the basis of viewpoint. *Cornelius*, 473 U.S. at 806. The government interests need not be compelling ones. *Id.* at 809.

The court begins with Evers's proffered interests, which implicitly articulate the purpose of the forum at issue. Evers says that its press-access criteria are intended to serve two interests: (1) limiting attendance for space constraints; and (2) ensuring that those in attendance are

established, bona fide journalists who will (a) maximize the public's access to newsworthy information and (b) be more likely to abide by professional journalistic standards, such as honoring embargoes and respecting the distinction between on- and off-the-record communications. These interests apply to both press conferences and press briefings. Because MacIver does not separately address them, the court will consider them together.

Evers's interest in addressing space constraints is manifestly reasonable, even though Evers does not say specifically how many journalists can be accommodated at the capitol. And even if the space used for press conferences and briefings were not filled to capacity, it would be reasonable to limit attendance to some number that would afford those in attendance a reasonable opportunity to ask questions. MacIver doesn't dispute that Evers has a legitimate interest in controlling press access for space or security concerns, and MacIver does not challenge Evers's credentialing process on this ground.

Evers's interest in audience impact and journalistic ethics are also legitimate concerns. To facilitate greater public access to newsworthy information, Evers includes criteria nos. 1, 2, and 3, designed to gauge journalistic impact, favoring journalists from organizations that (1) focus principally on news dissemination, (2) have published news continuously for at least 18 months and maintain periodical or established television or radio components, and (3) employ professional journalists (or student journalists working for student-run publications). These criteria are reasonably related to the goal of making sure that the journalists who attend press conferences and briefings will reach larger audiences. MacIver does not dispute the legitimacy of Evers's interest in journalistic impact or dispute that these criteria are reasonably related to that interest.

Evers also includes criteria nos. 4 and 5, which concern journalistic integrity. Criterion no. 4 favors journalists and organizations who avoid real or perceived conflicts of interests, entanglement with special interest groups, and other associations that might compromise journalistic integrity. Criterion no. 5 addresses the independence of the journalist from groups that engage in lobbying or advocacy. These criteria are based on standards used by other governmental bodies—Congress and the Wisconsin legislature—and they reflect longstanding, well-established norms. The court concludes that these criteria reflect reasonable efforts to advance a legitimate government objective.

### b. Viewpoint neutrality of press credential criteria

Evers's press-credentialing criteria are, at least as stated, viewpoint neutral. There is nothing about these traditional indicia of journalistic impact and integrity that favors one part of the political spectrum over another. MacIver does not contend otherwise.

MacIver's main argument is that the criteria are subjective, which vests broad discretion in Evers's staff, who apply the credentialing criteria unfairly, to the detriment of journalists with conservative viewpoints. MacIver relies primarily on three sets of comparators to demonstrate viewpoint discrimination.

First, MacIver contends that viewpoint discrimination may be inferred from the presence of three left-leaning outlets on the media advisory email list: *The Progressive*; *The Capital Times*; and *The Devil's Advocates Radio*, a liberal talk-radio show. But MacIver does not dispute that these three outlets are principally in the business of disseminating news and thus meet a threshold criterion that MacIver doesn't. As Evers points out, the media advisory email list includes several outlets that are widely viewed as conservative, including *The Washington Times*, *Fox News*, and *The Wall Street Journal*. MacIver argues that these are national outlets that

are unlikely to send journalists to cover Evers's press conferences. But that's not Evers's choice, and MacIver hasn't identified any local conservative media outlets that meet the credentialing criteria whose journalists have been excluded from the media advisory email list.

Second, MacIver contends that viewpoint discrimination can be inferred from the inclusion of comparators that are affiliated with organizations that engage in lobbying and advocacy activity. For instance, MacIver notes that the editors of two tribal newspapers—*Menominee Nation News* and *Kalihwisaks* (sponsored by the Oneida Nation)—are included on the list, even though both tribes are registered to lobby in Wisconsin. MacIver also cites WUWM (a public radio station operated by the University of Wisconsin-Milwaukee) and Wisconsin Public Television, both of which are on the list, even though both are affiliated with the University of Wisconsin Board of Regents, which retains legislative liaisons who engage in paid advocacy on behalf of the university system. MacIver says that many other entities on the list regularly engage in "lobbying" or "political advocacy" if those terms are defined as broadly as they have been applied to MacIver.

These are not helpful comparators because the media outlets are substantively independent from their parent organizations. Wisconsin Public Television, for example, operates as part of the University of Wisconsin and is thus under the auspices of the Board of Regents. But Wisconsin Public Television is not directly controlled by or funded exclusively by the Board of Regents. The *Menominee Nation News* may be affiliated with the tribe, and the tribe itself may engage in policy advocacy, but the *Menominee Nation News* functions as a stand-alone news organization. The relationship between these media outlets and their affiliated entities is nothing like the close connection between the MacIver Institute and the journalists who create content for its website.

Third, MacIver points out that some credentialled publications, such as the *Milwaukee Journal Sentinel* and the *Wisconsin State Journal* run editorials endorsing candidates in political races. And the media advisory email list includes many opinion journalists, columnists, and radio show hosts who regularly endorse causes, candidates, and legislation. Publishing editorials and endorsements does not disqualify an outlet under traditional standards of journalistic integrity, so long as the opinion staff and the news staff are separated. Again, MacIver has not demonstrated any separation between the ideological mission of the think tank and its news organization.

Fourth, MacIver contends that if Evers is serious about including only organizations whose "principal business" is "news dissemination," he should exclude journalists affiliated with most broadcast television networks and radio stations. After all, NBC, ABC, and CBS spend more time broadcasting sports and entertainment than news shows, and some of the radio stations on the media advisory email list dedicate more airtime to music than to news coverage. This is a variation on the argument made against Wisconsin Public Television, and it is based again on an overly expansive notion of "organization." The media advisory email list includes television and radio reporters who work for established news organizations, which in some cases are part of a larger media enterprise. Nothing in this supports the argument that Evers's press-credentialing process demonstrates viewpoint discrimination.

A truly relevant comparator would be a journalist from another think tank or advocacy group who is nevertheless included on the media advisory email list. For example, it would be probative of viewpoint discrimination if Jason Stein of the Wisconsin Policy Forum were on the list, because it would demonstrate that Evers includes journalists from some think tanks but not others. But Stein, a highly experienced journalist, isn't on the list and he was excluded

from Evers's press briefing on February 28, 2019, despite his express request to be included. *See* Dkt. 15-4. Stein's affiliation with a think tank rather than a journalistic enterprise resulted in his being treated just as Osmulki was treated.

None of the comparators that MacIver has identified raise an inference that Evers's press-access criteria have any viewpoint discriminatory effect. And without evidence of discriminatory effect, MacIver cannot prevail on its First Amendment claims. *See Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 100 F.3d 1287, 1299 (7th Cir. 1996) ("[I]t is th[e] unconstitutional effect that ultimately matters.").

MacIver contends that it employs experienced journalists, and it is nonpartisan, not registered to lobby, and does not (and cannot) endorse political candidates. The court agrees that its journalists, including plaintiff Osmulski, have sufficient professional experience to make them credible state capitol correspondents. But their personal credentials have never been the problem. Evers has reasonably concluded that MacIver is not a bona fide news organization. MacIver publicly brands itself as a think tank committed to ideological principles. It engages in policy-driven political advocacy, including advocating for specific initiatives and policy approaches. It has a "news" tab on its website, but it does not maintain a news-gathering organization separate from its overall ideological mission. It stands on the same footing as the Wisconsin Policy Forum.

Much of MacIver's opening brief, Dkt. 7, is devoted to showing that Evers is motivated to discriminate against MacIver's conservative viewpoint. And in its reply brief, Dkt. 19, at 3–4, MacIver contends that Evers's expressed interest in a "fair and unbiased press corps," Dkt. 7, at 12, demonstrates his intent to censor journalists that he thinks are unfair and biased. The court assumes that Evers would prefer favorable press coverage, and that as a Democrat, he

would be less inclined to appreciate the work of the MacIver Institute than his Republican predecessor. But Evers's personal or political motives are simply not material: it only matters that he has reasonable, viewpoint neutral criteria for granting access to his press conferences and press briefings. *See Grossbaum*, 100 F.3d at 1293 ("We are governed by laws, not by the intentions of legislators. Just as we would never uphold a law with unconstitutional effect because its enactors were benignly motivated, an illicit intent behind an otherwise valid government action indicates nothing more than a failed attempt to violate the Constitution." (citation and internal quotation marks omitted)).

MacIver has adduced no evidence that Evers grants or denies press access unreasonably or on the basis of the journalist's viewpoint. The court concludes that MacIver will not succeed on its First Amendment viewpoint discrimination claim and is not entitled to summary judgment on that claim.

### 4. Equal protection claim

MacIver's Fourteenth Amendment equal protection claim repackages its First Amendment claims. The court has already concluded that MacIver will not succeed under the First Amendment. Because MacIver hasn't shown that Evers's criteria infringes on a fundamental right, MacIver is not entitled to heightened review under the Equal Protection Clause. *See Perry Educ. Ass'n*, 460 U.S. at 54 (concluding that the entitlement-to-access argument that the Supreme Court rejected under the First Amendment "fares no better in equal protection garb"); *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 485 U.S. 360, 370 (1988) (where a statute has no substantial impact on a fundamental interest, the classification does not garner heightened scrutiny under the Equal Protection Clause).

Accordingly, in deciding MacIver's equal protection claim, the court evaluates Evers's press-access criteria under the deferential rational basis standard. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013). The press-access criteria easily survive rational-basis review, for the reasons explained above. The press-access criteria are reasonably related to Evers's asserted interests in accounting for space constraints, maximizing public access to information, and upholding journalistic standards. So the court concludes that MacIver will not succeed on its equal protection claim either.

**D. Balance of hardship**

Given the court's decision on the merits, the court will not consider the balance of harms at great length. MacIver says that the harms associated with its continued exclusion from the media advisory list are substantial, both to MacIver and its journalists and to the public at large, and that any hardship on Evers would be negligible because complying with an injunction would require nothing more than adding a few names to a listserv or setting out a few extra chairs at a press conference. Evers takes a broader view of the implications of an injunction. He contends that if he is ordered to grant access to MacIver, there will be no limiting principle by which he could restrict media access at all.

The court is persuaded that on balance, the harms of granting an injunction would outweigh the harms of maintaining the status quo. MacIver journalists won't have access to press conferences and briefings, but there is nothing to stop them from continuing to publish stories about Evers and his administration. But ordering Evers to grant access to MacIver journalists would establish an untenable precedent. Any citizen journalist could make the same case MacIver has made, forcing Evers to either permit unrestricted access at every event or

forego press events altogether. Under these circumstances, the balance of harms tips against an injunction.

**E. Conclusion**

The court concludes that the material facts are undisputed, but that the law supports Evers, not MacIver. Accordingly, the court will give MacIver ten days to show cause why summary judgment should not be granted to Evers.

ORDER

IT IS ORDERED that:

1. Plaintiffs' motion to consolidate the decision on the preliminary injunction with a decision on the merits under Federal Rule of Civil Procedure 65(a)(2), Dkt. 28, is GRANTED.

2. Plaintiffs' motion for preliminary injunction, Dkt. 6, is DENIED.

3. Plaintiffs must respond to the court's Rule 56(f) notice by April 10, 2020, showing why the court should not grant summary judgment against them on all claims.

Entered March 31, 2020.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge